983 A.2d 1211

COMMONWEALTH of Pennsylvania, Appellee

v.

Cletus RIVERA, Appellant.

Supreme Court of Pennsylvania.

Argued May 12, 2009.

Decided Nov. 30, 2009.

344

Jay Michael Nigrini, Esq., Sodomsky & Nigrini, for Cletus C. Rivera.

Christopher D. Carusone, Esq., Amy Zapp, Esq., Karl Kenneth Brown, II, Esq., Kelley Lynn Nelson, Esq., PA Office of Attorney General, for Commonwealth of Pennsylvania.

BEFORE: CASTILLE, C.J., and SAYLOR, EAKIN, BAER, TODD, McCAFFERY and GREENSPAN, JJ.

*OPINION*

Justice BAER.

This is a direct appeal from the judgment of sentence of death imposed by the Berks County Common Pleas Court following Appellant's conviction of first degree murder of a police officer and related offenses.[1] At trial, Appellant testified that he intended to shoot and kill the victim, but that he did so in self-defense, as he was unaware that the victim was a police officer, and instead believed his life was in danger. Thus, we must determine, *inter alia*, whether the Commonwealth disproved Appellant's claim of self-defense beyond a reasonable doubt. For the reasons set forth herein, we conclude that the Commonwealth satisfied its burden in this regard, and reject the remaining claims raised by Appellant. Accordingly, we affirm Appellant's judgment of sentence.

The record establishes that on August 6, 2006, Scott Wertz and Malcolm Eddinger were working as plainclothes police officers in the auto theft task force of the Reading Police Department. At approximately 2:00 a.m., the officers observed a large crowd in the parking lot of a Getty Mart, located at Eighth and Walnut Streets in the City of Reading. Moments later, a radio broadcast from dispatch informed the officers of a fight at that location, and advised that one individual threatened to shoot another. N.T. 8/4/2008 at 119. Having failed to observe any actual fighting, the officers pulled over their unmarked vehicle so that they could continue to view the crowd.

While in their car, the officers heard what they believed to be a firecracker or small caliber gunshot. As they did not want to approach the group of individuals in plainclothes, and Officer Wertz was wearing shorts, they remained in their vehicle and waited for uniformed officers to arrive. *Id.* at 125. Officer Eddinger then heard three or four gunshots, which he believed were fired from a large caliber gun in the parking lot. *Id.* Officer Wertz thereafter stated, "The guy in the blue

1. Pursuant to 42 Pa.C.S. § 9711(h), this Court directly reviews all cases in which the death penalty is imposed.

shirt." *Id.* at 127. At that moment, Officer Eddinger observed a man wearing a blue polo shirt, who was later identified as Appellant, walk out of the parking lot and place an object into his waistband. *Id.* at 127–28.

Officer Wertz jumped out of his vehicle and Officer Eddinger followed. Officer Eddinger observed Appellant stop in front of a home at 142 North Eighth Street to speak with five or six people. *Id.* at 128. Unbeknownst to Appellant, Officer Wertz ran up behind Appellant and stopped within a foot of him. *Id.* at 130. Appellant then turned around and stood face-to-face with Officer Wertz for a few seconds before Appellant ran south on Eighth Street. While Officer Eddinger did not see their lips moving during the brief face-to-face encounter, it looked as though Appellant and Officer Wertz had spoken by the way they were standing. *Id.* at 133.

Without drawing his weapon, Officer Wertz ran down the sidewalk and chased Appellant. Officer Eddinger followed, running parallel to them in the middle of the street. *Id.* at 134–35. At no time during the chase did Officer Eddinger hear Officer Wertz identify himself as a police officer or direct Appellant to stop. *Id.* at 173. As the pursuit continued, Officer Eddinger saw Appellant turn and look over his left shoulder. *Id.* at 136. He then heard two gunshots, saw two muzzle flashes, and saw both Officer Wertz and Appellant fall to the ground. *Id.* at 137. Officer Eddinger immediately ran over to Appellant, grabbed him by the collar, and put his knee on Appellant's back to apprehend him. *Id.* at 139. A firearm was found under Appellant on the street. *Id.* at 148; 153.

Once Appellant was handcuffed, Officer Eddinger called out to Officer Wertz, who did not respond. *Id.* at 142. When Officer Eddinger approached him, Officer Wertz had blood coming from his mouth and was unmoving. *Id.* at 144. Moments after the incident, several officers noted that Officer Wertz's gun was strapped inside its holster, which was attached to Officer Wertz's belt. N.T. 8/5/2008 at 218; 234; 299; 558. Further, an asp baton, which is a law enforcement instrument used for self-protection, was recovered on the

street in close proximity to where Officer Wertz's body lay. N.T. 8/5/2008 at 359-61.[2]

At 2:30 a.m., Officer Wertz was pronounced dead. Dr. Neil Hoffman subsequently performed an autopsy, which revealed that Officer Wertz had been hit by two bullets, one penetrating the left side of his chest, and the other striking him in the perineum.[3] N.T. 8/6/2008 at 440; 443; and 449. According to forensic expert, Kurt Tempinski, chemical testing demonstrated that the shot which struck Officer Wertz in the chest had been fired from a distance of four feet. *Id.* at 509. The bullet which struck Officer Wertz in the perineum had been fired when the muzzle of the weapon was either touching or was within three inches of the fabric of the officer's shorts. *Id.* at 511. This evidence led Dr. Hoffman to conclude that Appellant first shot Officer Wertz in the chest, causing him to fall forward, bringing him in close contact with Appellant, who then fired a second time. *Id.* at 461.

Prior to trial, Appellant filed a motion *in limine* to preclude the Commonwealth from introducing evidence of Appellant's several prior juvenile convictions. On August 30, 2007, the trial court entered an order denying such motion.

Appellant's trial commenced on August 4, 2008.[4] The Commonwealth's primary witness was Officer Eddinger, who testified as to his observations of the surveillance of the Getty Mart parking lot, the subsequent chase of Appellant, the shots that ultimately killed Officer Wertz, and the apprehension of Appellant. Relevant to this appeal, on cross-examination, the trial court sustained the Commonwealth's objection when de-

2. While the asp recovered at the murder scene was not specifically identified as having belonged to Officer Wertz, no other officer claimed ownership of it. *See* N.T. 8/6/2008 at 582 (providing that none of officers at the Reading Police Department indicated that his or her asp was missing when asked that question *via* an email sent after the murder).

3. The perineum is the region of the body inferior to the pelvic diaphragm and between the legs.

4. We note that the Office of Attorney General accepted jurisdiction of this matter at the request of the Berks County District Attorney's Office, due to a conflict of interest.

fense counsel asked Officer Eddinger whether he held any sense of guilt or responsibility based upon what took place on the night of the murder. N.T. 8/4/2008 at 191. The trial court again sustained the Commonwealth's objection when defense counsel asked Officer Eddinger whether he wanted to see Appellant put to death. *Id.*

The Commonwealth further presented the testimony of additional police officers who responded to the murder scene. Germane to an issue raised by Appellant, criminal investigator Judith Wise testified that on the night in question, she responded to a radio transmission reporting that an officer was in distress. N.T. 8/5/2008 at 292–93. When she learned that Officer Wertz had been shot, she described looking for witnesses as the large crowd was dispersing. *Id.* at 295. Detective Wise stated that she realized that no witnesses would be willing to give statements to the police when someone in the crowd shouted, "F_ _ _ the cops, f_ _ _ you all." *Id.* Additionally, the Commonwealth presented the testimony of a jailhouse informant, Jason Ott, who stated that while in his jail cell, Appellant confessed that he shot an officer and would get away with it because there were fifty or sixty people at the scene. N.T. 8/6/2008 at 416.

Appellant testified on his own behalf, asserting that he fired his weapon in self-defense. He explained that he was in the Getty Mart parking lot when he saw an unidentified Hispanic man in a black shirt, standing approximately ten feet from Appellant's friends, pull out a gun and point it at them. N.T. 8/7/08 at 612–13; 641. Fearing that the man was going to harm his friends, Appellant stated that he fired his own weapon into the air four or five times to "break everything up." *Id.* at 613. Moments later, according to Appellant, a different man, whom he did not recognize, ran toward him. *Id.* at 619, 621.[5] Appellant asserted that the man never identified himself as a police officer, never shouted for him to stop, and never stated that he was under arrest. *Id.* at 620.

5. To be precise, Appellant stated that while he knew the man chasing him was not the man in the black shirt who had pointed the gun at his friends, he believed he could have been one of his friends. *Id.* at 659.

He testified that he saw a dark object in the hand of the man chasing him, which looked like a gun. *Id.* at 622; 663. Believing that he was going to be shot, Appellant stated that he twice fired his gun at the man. *Id.* Appellant testified that he did not know that the man chasing him was a police officer until after he fired his weapon and heard someone say, "police officer down." *Id.* at 624–25. On cross-examination, Appellant admitted that he had no license to carry a firearm, *id.* at 632; that he had stolen the gun he had fired on the night of the murder, *id.* at 643; and that he intended to cause serious bodily injury or death to the person chasing him. *Id.* at 636–37. He further testified that there was nothing preventing him from continuing to run from his pursuer, but that he fired his weapon because he thought he was going to be shot. *Id.* 664–65.

Additionally, while still on direct examination, Appellant, who was twenty-four years old at the time of the murder in 2006, and twenty-six years-old at the time of trial, described his prior juvenile criminal history. This criminal history included: (1) a July 20, 1995 adjudication of delinquency for robbery, theft, and receiving stolen property for stealing a bike from another individual, which occurred when Appellant was 13; (2) a separate July 20, 1995 adjudication of delinquency for stealing a bike from a garage; (3) an October 1, 1996 adjudication of delinquency for conspiring to commit theft by stealing clothing from a clothesline; (4) an April 7, 1997 adjudication of delinquency for stealing a game system and other items from a residence; and (5) an August 21, 1997 adjudication for theft for stealing a bike.

After the parties presented closing arguments, the trial court charged the jury, *inter alia,* on the elements of first degree murder, N.T. 8/7/2008 at 761–62, third degree murder, *id.* at 762–64, unreasonable belief voluntary manslaughter,[6] *id.*

6. As explained in more detail, *infra,* the law provides for a conviction of voluntary manslaughter under two different circumstances. *Commonwealth v. Weston,* 749 A.2d 458, 462 (Pa.2000). A person is guilty of voluntary manslaughter if: (1) he acted under a sudden and intense passion resulting from a serious provocation; or (2) he "knowingly and

at 764–65, as well as the law relating to the affirmative defense of self-defense. *Id.* at 756–758.[7] Having resolved conflicts in the testimony in favor of the Commonwealth, the jury returned a verdict of guilty of first degree murder, aggravated assault, firearms not to be carried without a license, and possessing instruments of crime.

The penalty phase of the trial was thereafter conducted wherein the Commonwealth presented evidence in support of three aggravating circumstances, namely, that the victim was a police officer who was killed in the performance of his duties, 42 Pa.C.S. § 9711(d)(1), that Appellant created a grave risk of death to another person in addition to the victim of the offense, *id.* at § 9711(d)(7), and that Appellant had a significant history of felony convictions involving the use or threat of violence to the person. *Id.* at § 9711(d)(9). Defense counsel presented evidence in support of the mitigating circumstance of the age of the defendant at the time of the crime (twenty-four), *id.* at § 9711(e)(4), and "any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense." *Id.* at § 9711(e)(8).

Relevant to an issue raised herein, during penalty phase closing argument, the prosecutor reiterated Investigator Wise's trial testimony that "associates of [Appellant] and the other people that were there" shouted at the crime scene, "F_ _ _ you all, f_ _ _ the cops." N.T. 8/13/2008 at 126. Defense counsel did not object during the prosecutor's closing or immediately thereafter. Instead, after completing his own closing argument and following a fifteen-minute recess, defense counsel requested a cautionary instruction on the ground

intentionally kills an individual" under the unreasonable belief that the killing was justified. *Id.* (citing 18 Pa.C.S. § 2503(a) and (b)). The latter definition, or "unreasonable belief of self-defense voluntary manslaughter," has been colloquially referred to as "imperfect self-defense." *Commonwealth v. Tilley*, 528 Pa. 125, 595 A.2d 575, 582 (1991). Unlike the affirmative defense of self-defense, which is a justification for the crime and, if accepted, results in acquittal, a finding of imperfect self-defense results in conviction of the offense of voluntary manslaughter.

7. Appellant does not challenge the propriety of the jury charges in this appeal.

that the quoted reference did not reflect Appellant's state of mind or his attitude toward police. The trial court emphasized that the prosecutor's comment was based on testimony given during the guilt phase of trial, and that defense counsel could have objected thereto. *Id.* at 136. Ultimately, the court indicated that it would see if it could "work something in" the penalty phase jury charge at the appropriate point. *Id.* The final charge given to the jury did not include a reference to the challenged remark.

On August 13, 2008, after the penalty phase of the trial had been concluded, the jury returned a verdict of death. It found two aggravating circumstances: that the victim was a police officer who was killed in the performance of his duties; and that Appellant created a grave risk of death to another person in addition to the victim of the offense. The jury concluded that these two aggravating circumstances outweighed the one mitigating circumstance found, regarding other mitigation evidence concerning the character and record of the defendant and the circumstances of his offense pursuant to the catchall mitigator. On that same date, Appellant was formally sentenced to death for first degree murder, with consecutive sentences imposed for the remaining convictions.

Appellant filed a timely post-sentence motion on August 19, 2008, challenging the weight of the evidence in support of the convictions of first degree murder and possessing instruments of crime. The trial court denied the motion without an opinion. In due course, Appellant thereafter filed a Pa.R.A.P. 1925(b) statement of matters complained of on appeal, in which he raised four claims: (1) whether the trial court erred in denying his post-sentence motion challenging the weight of the evidence; (2) whether the trial court erred by denying his motion *in limine* to preclude the admission of Appellant's juvenile adjudications for *crimen falsi* offenses; (3) whether the trial court erred in denying Appellant's request for a cautionary instruction during the penalty phase after the prosecutor stated during closing argument that people at the murder scene shouted, "f_ _ _ the cops;" and, (4) whether the trial court erred in precluding defense counsel from asking

questions regarding Officer Eddinger's bias and interest in the case.

Considering the facts as found by the jury, the trial court's Pa.R.A.P.1925(a) opinion rejected Appellant's challenge to the weight of the evidence, and held that the verdict of guilt was "well-reasoned and did not shock one's sense of justice." Trial Court Opinion at 6. It further held that the court's denial of Appellant's post-sentence motion was "not manifestly unreasonable, was not the result of misapplication of law, and was not the result of partiality, prejudice, bias, or ill will." *Id.*

Relying on Pa.R.E. 609, which governs impeachment by evidence of a prior conviction, the court held that it did not abuse its discretion by permitting evidence of Appellant's *crimen falsi* juvenile adjudications. It reasoned that the *crimen falsi* adjudications "reflected substantially upon [Appellant's] veracity and do not suggest a propensity to commit the serious offense with which [Appellant] was charged in this case, namely murder." Trial Court Opinion at 9. The court emphasized that credibility was critical as Appellant contended he acted in self-defense, and it was the Commonwealth's burden to prove that his acts were not justifiable. Considering that Officer Eddinger was the only eyewitness, and could not have testified as to whether Appellant believed he was in danger of death or serious bodily injury, the court concluded that the probative value of the *crimen falsi* evidence substantially outweighed any prejudicial effect. *Id.* at 10.

Additionally, the trial court found waived Appellant's claim that it erred by denying his request for a cautionary instruction after the prosecutor stated in his closing argument that people at the crime scene shouted, "F_ _ _ the cops." The court noted that defense counsel did not object during the prosecutor's closing argument, and did not timely seek a cautionary instruction. Nevertheless, the court further held that the claim failed on the merits because the statement was unlikely to inflame the jury as it was not attributable to Appellant, but rather to "associates of [Appellant] and other people that were there." N.T. 8/13/2008 at 126. The court

further emphasized that the comment "was a fair assessment of the evidence presented at trial." Trial Court Opinion at 11.

Finally, the trial court rejected Appellant's claim that it precluded defense counsel from cross-examining Officer Eddinger regarding bias. Noting that Appellant did not specify how he was precluded from demonstrating bias, the trial court assumed he was referring to two Commonwealth objections the court sustained when defense counsel asked Officer Eddinger: (1) whether he held any sense of guilt or responsibility based on what took place on the night of the murder; and (2) whether he wanted to see Appellant put to death. The court held that it did not abuse its discretion in sustaining the Commonwealth's objections because such questions were, *inter alia,* irrelevant to the case. The trial court explained that defense counsel was otherwise permitted to fully cross-examine Officer Eddinger regarding any potential bias, and that he, in fact, did so.

Appellant raises the same four issues in this direct appeal as he did in the trial court.

## I. Sufficiency of the Evidence

Although not specifically challenged by Appellant, we begin by independently reviewing the evidence to ensure that it is sufficient to support his conviction of first degree murder. *See Commonwealth v. Zettlemoyer,* 500 Pa. 16, 454 A.2d 937, 942 n. 3 (1982), *cert. denied,* 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983) (providing that this Court automatically undertakes review of the sufficiency of the evidence in each case in which the death penalty is imposed).[8] When reviewing the sufficiency of the evidence, "we view the evidence in the light most favorable to the Commonwealth as the verdict winner to determine if the evidence and all reasonable

---

8. We conduct our review of the sufficiency of the evidence, notwithstanding the fact that by challenging the weight of the evidence, Appellant is conceding that the evidence is sufficient to support his conviction of first degree murder. *See Commonwealth v. Widmer,* 560 Pa. 308, 744 A.2d 745, 751 (2000) (providing that "[a] motion for new trial on the grounds that the verdict is contrary to the weight of the evidence, concedes that there is sufficient evidence to sustain the verdict.").

inferences derived therefrom are sufficient to establish all elements of the offense beyond a reasonable doubt." *Commonwealth v. VanDivner*, 599 Pa. 617, 962 A.2d 1170, 1176 (2009) (citations omitted). To sustain a conviction for murder of the first-degree, the Commonwealth must prove that: (1) a human being was unlawfully killed; (2) the person accused is responsible for the killing; and (3) the accused acted with specific intent to kill. 18 Pa.C.S. § 2502(d); *VanDivner*, 962 A.2d at 1176. "Specific intent may be inferred from the use of a deadly weapon on a vital part of the victim's body." *Id.,citing Commonwealth v. Rivera*, 565 Pa. 289, 773 A.2d 131, 135 (2001), *cert. denied*, 535 U.S. 955, 122 S.Ct. 1360, 152 L.Ed.2d 355 (2002). Also, we are cognizant that the period of reflection required for premeditation to establish the specific intent to kill "may be very brief; in fact the design to kill can be formulated in a fraction of a second. Premeditation and deliberation exist whenever the assailant possesses the conscious purpose to bring about death." *Commonwealth v. Drumheller*, 570 Pa. 117, 808 A.2d 893, 910 (2002). Further, the trier of fact, in passing upon the credibility of the witnesses, is "free to believe all, part, or none of the evidence." *Commonwealth v. Cousar*, 593 Pa. 204, 928 A.2d 1025, 1033 (2007).

The testimony of Officer Eddinger as to the circumstances surrounding Appellant's shooting of Officer Wertz, coupled with Appellant's own testimony that he twice shot the person chasing him with the specific intent to cause serious bodily injury or death, enabled the Commonwealth to establish the elements of first-degree murder. Appellant, however, offered an affirmative defense to the charge. He claimed that he acted in self-defense, believing, albeit mistakenly, that Officer Wertz sought to kill him. *See* Appellant's Brief at 18 (stating that "it is clear from the record that Appellant was mistaken in his belief that Wertz was holding a gun.").

When the defendant introduces evidence of self-defense, the Commonwealth bears the burden of disproving such a defense beyond a reasonable doubt. *Commonwealth v. Torres*, 564 Pa. 219, 766 A.2d 342, 345 (2001). "[T]he Com-

monwealth cannot sustain its burden of proof solely on the factfinder's disbelief of the defendant's testimony. The 'disbelief of a denial does not, taken alone, afford affirmative proof that the denied fact existed so as to satisfy a proponent's burden of proving that fact.'" *Id.* (quoting *Commonwealth v. Graham,* 528 Pa. 250, 596 A.2d 1117, 1118 (1991)).

To elucidate the Commonwealth's specific burden in disproving Appellant's claim of self-defense, we look to Section 505 of our Crimes Code, 18 Pa.C.S. § 505. As set forth below, we note that subsection (a) of that provision addresses when force is justifiable, while subsection (b) sets forth limits on the justifiable use of force. Section 505 states, in relevant part:

**§ 505. Use of force in self-protection**

**(a) Use of force justifiable for protection of the person.**—The use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion.

**(b) Limitations on justifying necessity for use of force.**—

\* \* \*

(2) The use of deadly force is not justifiable under this section unless the actor believes that such force is necessary to protect himself against death, serious bodily injury, kidnapping or sexual intercourse compelled by force or threat; nor is it justifiable if:

(i) the actor, with the intent of causing death or serious bodily injury, provoked the use of force against himself in the same encounter; or

(ii) the actor knows that he can avoid the necessity of using such force with complete safety by retreating or by surrendering possession of a thing to a person asserting a claim of right thereto or by complying with a demand that

he abstain from any action which he has no duty to take.... [9]

18 Pa.C.S. § 505(a), (b)(2)(i), (ii).

Viewing the evidence in the light most favorable to the Commonwealth as verdict winner, as we must, we find that the Commonwealth disproved Appellant's claim of self-defense beyond a reasonable doubt. Specifically, the Commonwealth presented undisputed evidence that Officer Wertz did not draw his weapon during his pursuit of Appellant and, thus, never exerted "unlawful force" under Section 505(a). Accordingly, Appellant was not justified in responding to the officer's pursuit by employing deadly force. Under the Commonwealth's version of the facts, which the jury accepted, Officer Wertz chased Appellant after Appellant had fired his weapon in a crowded parking lot, and Appellant reacted by fatally shooting him. While the jury was free to believe Appellant's testimony relating to self-defense, *i.e.*, that he reasonably believed Officer Wertz had drawn a weapon and was going to kill him, the jury did not do so here. *See Commonwealth v. Bracey*, 541 Pa. 322, 662 A.2d 1062, 1066 (1995) (holding that "the jury was free to disbelieve the evidence proffered by Appellant in support of claim of reduced intent and/or self-defense"); *Commonwealth v. Carbone*, 524 Pa. 551, 574 A.2d 584, 589 (1990) (providing that "[a]lthough the Commonwealth is required to disprove a claim of self-defense arising from any source beyond a reasonable doubt, a jury is not required to believe the testimony of the defendant who raises the claim"). Accordingly, Appellant's use of force was not justified pursuant to Section 505(a).[10]

9. Subsection (ii) proceeds to set forth two exceptions, which are not relevant here.

10. We further note that, even if Appellant reasonably believed that Officer Wertz was pursuing him with a deadly weapon, the use of force employed by Appellant was excessive in that he shot Officer Wertz a second time at close range after already having shot him in the chest, causing the victim to fall forward. *See* N.T. 9/6/2008 at 460–61 (providing that forensic expert Kurt Tempinski opined that Appellant first shot Officer Wertz in the chest from a distance, causing him to fall forward, and then fired a second shot when the muzzle of the weapon was either touching or was within three inches of the fabric of the officer's shorts);

Turning to subsection (b)(2) of Section 505, the evidence, when viewed in the proper light, demonstrates that Appellant was the aggressor in using deadly force as it is clear that his firing of a gun in the crowded parking lot was the catalyst for the tragic chain of events that followed. Appellant, himself, testified that he had fired his weapon in the parking lot, that the chase by Officer Wertz followed thereafter, and that Appellant proceeded to fire two shots, which fatally wounded Officer Wertz. Thus, the Commonwealth demonstrated beyond a reasonable doubt that Appellant "with the intent of causing death or serious bodily injury, provoked the use of force against himself in the same encounter." 18 Pa.C.S. § 505(b)(2)(i). *Cf. Commonwealth v. Samuel*, 527 Pa. 298, 590 A.2d 1245, 1248 (1991) (providing that mere display of gun in a non-threatening manner, as opposed to drawing or firing the weapon, was insufficient to establish that the defendant provoked the encounter and forfeited his right to assert self-defense under Section 505(b)(2)(i)). As noted, the record demonstrates that Officer Wertz did nothing more than chase an individual who had illegally fired a weapon and had endangered individuals who had gathered in a populated area.

Finally, the evidence demonstrates that Appellant could have avoided the use of force by retreating with complete safety pursuant to Section 505(b)(2)(ii), as Appellant conceded in his testimony that nothing prevented him from continuing to run from Officer Wertz without using deadly force. N.T. 8/7/2008 at 664–65.

Accordingly, we have little difficulty concluding that the evidence was sufficient to demonstrate that Appellant unlawfully killed Officer Wertz, and that such killing was willful, deliberate, and premeditated. Having satisfied the elements

*see also Commonwealth v. Harvey*, 571 Pa. 533, 812 A.2d 1190, 1196 (2002) (holding that evidence was sufficient to disprove self-defense claim when autopsy report revealed that the defendant shot the victim a total of six times, which was simply more force than would have been necessary to protect himself); *Commonwealth v. Washington*, 547 Pa. 563, 692 A.2d 1024, 1029 (1997) (holding that after the first shot brought the victim to the ground, the defendant could not reasonably believe that his life was still in danger and that it was necessary to shoot the victim twice in the head).

of first degree murder, we further conclude that the Common-wealth presented sufficient evidence to disprove Appellant's claim of self-defense beyond a reasonable doubt. We now proceed to address the claims raised by Appellant.

## II. Weight of the Evidence

Appellant's first claim is that the trial court erred by denying his post-sentence motion challenging the weight of the evidence in support of his convictions of first degree murder and possessing instruments of crime. Appellant maintains that because he held a mistaken belief that his life was in danger at the moment he shot Officer Wertz, the jury's verdict of guilty of first degree murder is contrary to the weight of the evidence, and the trial court should have reweighed the evidence to conclude that he was guilty of unreasonable belief voluntary manslaughter, otherwise known as "imperfect self-defense." [11] As he asserted at trial, Appellant reiterates that he did not know the man chasing him was a police officer, and mistakenly believed the victim possessed a gun and posed a threat to Appellant's life.

In support thereof, Appellant points out that Officer Wertz pursued him after another individual in the Getty Mart parking lot had brandished a gun, and that he believed that Officer Wertz was associated with the person he had just encountered. He emphasizes that neither the clothing nor conduct of Officer Wertz indicated he was a police officer. Moreover, Appellant submits that the evidence demonstrated that an asp baton was found in the area where Officer Wertz had been shot, which no other officer claimed. He concludes that the item in Officer Wertz's hand, which he believed to be a gun,

---

11. Pursuant to Section 2503(b) of the Crimes Code, "[a] person who intentionally or knowingly kills an individual commits voluntary man-slaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify the killing under Chapter 5 of this title, but his belief is unreasonable." 18 Pa.C.S. § 2503(b). Thus, had the jury believed that Appellant killed Officer Wertz under the unreasonable belief that the killing was justified, it would have returned a verdict of guilty of voluntary manslaughter. However, we reiterate that had the jury concluded that the killing was, in fact, justified because it was committed in self-defense, Appellant would have been acquitted.

was the asp baton found at the scene. Believing that the person pursing him was about to shoot him, Appellant maintains that he thought he was justified in firing his weapon. Although he concedes that ultimately his belief in this regard was mistaken, he maintains that his conviction should be reduced to voluntary manslaughter. Similarly, Appellant argues that his conviction of possessing instruments of crime should also be vacated, as the weight of the evidence demonstrates that he did not possess the gun for a criminal purpose, but rather for self-protection.[12]

In response, the Commonwealth argues that Appellant has failed to meet the unquestionably high standard for establishing that the trial court abused its discretion in denying his motion for a new trial based upon a challenge to the weight of the evidence. It submits that the trial court correctly concluded that the verdicts of first degree murder and possessing instruments of crime were well-reasoned, and did not shock one's sense of justice because they were based upon credible evidence presented at trial. The Commonwealth points out that after being properly instructed on both the affirmative defense of self-defense and the elements of unreasonable belief voluntary manslaughter, the jury understandably chose to disbelieve Appellant's testimony, which was rife with inconsistencies.[13] According to the Commonwealth, the jury simply

**12.** Section 907 of the Crimes Code, entitled, "Possessing instruments of crime" provides that a "person commits a misdemeanor of the first degree if he possesses any instrument of crime with intent to employ it criminally." 18 Pa.C.S. § 907(a).

**13.** For example, regarding whether Appellant believed deadly force was necessary, the Commonwealth points out that Appellant testified that he "didn't really look" at what was in Officer Wertz's hand, and "couldn't tell" whether Officer Wertz had anything in his hand. N.T. 8/7/2008 at 619, 655. When asked to describe what he saw in Officer Wertz's hand during the chase, Appellant responded, "I'm not sure what it was. It— I know it was dark." *Id.* at 622. Upon further prompting by defense counsel, Appellant claimed that the object looked like "a gun." *Id.* The Commonwealth asserts that Appellant's testimony relating to his motivation for the shooting was similarly contradictory as Appellant gave the following reasons why he shot Officer Wertz: (1) "I thought I was going to be shot;" *id.* at 622; 665; (2) I wanted "to get him to stop chasing me;" *id.* at 623; (3) "I wasn't thinking when I pulled the trigger. I just pointed it back and fired.... It was an accident." *id.* at

exercised its prerogative to accept all, part, or none of the evidence, resolved conflicts in the testimony in favor of the Commonwealth, and ultimately concluded that Appellant possessed the specific intent to kill Officer Wertz. Under these circumstances, the Commonwealth urges our Court to decline Appellant's invitation to substitute our judgment for that of the fact finder.

The Commonwealth further illustrates why the jury's rejection of Appellant's claim of self-defense is consistent with the weight of the evidence. It reiterates that to disprove Appellant's claim of justifiable self-defense, the Commonwealth was only required to demonstrate *one* of the following: (1) that Appellant did not reasonably believe he was in danger of death or serious bodily injury; (2) that Appellant provoked the use of force; or (3) that Appellant could have retreated with complete safety. Nevertheless, it asserts that it sufficiently disproved all three elements of self-defense. The Commonwealth submits that Appellant could not have reasonably believed that he was in danger of death when the evidence is undisputed that Officer Wertz never actually drew his firearm.[14] It further asserts that Appellant provoked the use of deadly force when he discharged his firearm in a crowded parking lot. Finally, the Commonwealth maintains that the evidence established that Appellant could have safely retreated from Officer Wertz's pursuit, as he conceded that there was nothing preventing him from continuing to run.

Likewise, the Commonwealth maintains that the jury's failure to convict Appellant of unreasonable belief voluntary manslaughter or imperfect self-defense is consistent with the weight of the evidence, and that Appellant's contention to the contrary fails. Based on this Court's decision in *Commonwealth v. Tilley*, 528 Pa. 125, 595 A.2d 575 (1991), the Com-

634; and (4) because Appellant intended "to cause serious bodily injury or death to the person that was chasing him." *Id.* at 636–37.

14. As noted, although Appellant testified that he thought Officer Wertz drew a firearm, the record establishes that Appellant's belief was mistaken because Officer Wertz's weapon was found strapped in its holster after the shooting.

monwealth maintains that a claim of imperfect self-defense must satisfy all the requisites of justifiable self-defense (including that the defendant was not the aggressor and did not violate a duty to retreat safety), with the exception that imperfect self-defense involves an *unreasonable*, rather than a reasonable, belief that deadly force was required to save the actor's life. Thus, it concludes that because it disproved the remaining elements of a self-defense claim by demonstrating that Appellant was the initiator of the deadly force and could have retreated safely without the use of force, the weight of the evidence could not have supported a conviction of unreasonable belief voluntary manslaughter. We agree.

We begin our analysis by recognizing that "[a] verdict is against the weight of the evidence 'only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice.'" *Commonwealth v. VanDivner*, 962 A.2d at 1177 (citing *Commonwealth v. Cousar*, 593 Pa. 204, 928 A.2d 1025, 1036 (2007)). It is well established that a weight of the evidence claim is addressed to the discretion of the trial court. *Commonwealth v. Widmer*, 560 Pa. 308, 744 A.2d 745, 751–52 (2000). "A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion." *Id.* at 752. Rather, the role of the trial court is to determine that notwithstanding all the evidence, certain facts are so clearly of greater weight that to ignore them, or to give them equal weight with all the facts, is to deny justice. *Id.* A motion for a new trial on the grounds that the verdict is contrary to the weight of the evidence concedes that there is sufficient evidence to sustain the verdict; thus the trial court is under no obligation to view the evidence in the light most favorable to the verdict winner. *Widmer*, 744 A.2d at 751.

Significantly, in a challenge to the weight of the evidence, the function of an appellate court on appeal is to review the trial court's exercise of discretion based upon a review of the record, rather than to consider *de novo* the underlying question of the weight of the evidence. *VanDiv-*

*ner*, 962 A.2d at 1178. In determining whether this standard has been met, "appellate review is limited to whether the trial judge's discretion was properly exercised, and relief will only be granted where the facts and inferences of record disclose a palpable abuse of discretion." *Commonwealth v. Diggs*, 597 Pa. 28, 949 A.2d 873, 879 (2008). It is for this reason that the trial court's denial of a motion for a new trial based on a weight of the evidence claim is the least assailable of its rulings. *Id.* at 879–880.

Application of these concepts to the facts presented demonstrates that the trial court did not palpably abuse its discretion by rejecting Appellant's challenge to the weight of the evidence. As noted, Section 2503(b) of the Crimes Code defines unreasonable belief voluntary manslaughter as follows:

A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify the killing under Chapter 5 of this title, but his belief is unreasonable.

18 Pa.C.S. § 2503(b).

Consequently, as recognized by the Commonwealth, our Court in *Tilley, supra*, held that an imperfect self-defense claim "is imperfect in only one respect—an unreasonable rather than a reasonable belief that deadly force was required to save the actor's life. All other principles of justification under 18 Pa.C.S. § 505 must have been met. . . ." *Tilley*, 595 A.2d at 582. As we have concluded that the remaining principles of justification have not been satisfied here, Appellant's claim that the weight of the evidence supports a finding of unreasonable belief voluntary manslaughter is unsupportable. Further, Appellant did not persuade the trial court that the jury ignored any particular facts to which it should have given greater weight. Under these circumstances, the trial court did not abuse its discretion in rejecting Appellant's weight of the evidence claim.

 We further conclude that Appellant's challenge to the weight of the evidence supporting his conviction of possessing

an instrument of crime is equally unpersuasive. As indicated, *supra,* Section 907 of the Crimes Code, entitled, "Possessing instruments of crime," provides that a "person commits a misdemeanor of the first degree if he possesses any instrument of crime with intent to employ it criminally." 18 Pa.C.S. § 907(a). Having determined that the weight of the evidence supports an intentional killing, we similarly conclude that the weight of the evidence supports the jury's verdict of possessing an instrument of crime as the evidence demonstrates that Appellant intended to criminally employ his weapon at the moment he shot Officer Wertz. Thus, the verdict does not shock one's sense of justice, and the trial court did not abuse its discretion by denying relief on Appellant's challenge to the weight of the evidence supporting the conviction for possessing an instrument of crime.

## III. Denial of Motion *in Limine* to Preclude Juvenile Adjudications

Appellant next contends that the trial court abused its discretion by denying his motion *in limine,* which requested the exclusion of evidence of his five juvenile adjudications that occurred in 1995 through 1997, more than ten years prior to his trial, which commenced on August 4, 2008.[15] As noted, Appellant's juvenile adjudications consisted of the following: (1) a July 20, 1995 adjudication for robbery, theft, and receiving stolen property; (2) a July 20, 1995 adjudication for burglary; (3) an October 1, 1996 adjudication for conspiracy to commit theft; (4) an April 7, 1997 adjudication for burglary; and (5) an August 21, 1997 adjudication for theft.

Before discussing the parties' arguments on this issue, we examine the legal basis for their contention, namely our decision in *Commonwealth v. Randall,* 515 Pa. 410, 528 A.2d 1326 (1987), and our subsequent adoption of Pa.R.E. 609. In *Randall,* this Court held that "evidence of prior convictions

15. Appellant, himself, introduced evidence of his prior juvenile adjudications due to the trial court's denial of his motion *in limine* to preclude them. Thus, we note that the issue before us is not the propriety of the trial court's admission of the evidence, but rather the propriety of the trial court's ruling on Appellant's motion *in limine.*

can be introduced for the purpose of impeaching the credibility of a witness if the conviction was for an offense involving dishonesty or false statement, and the date of conviction or the last date of confinement is within ten years of the trial date." *Id.*, 528 A.2d at 1329.[16] We went on to hold that "[i]f a period greater than ten years has expired the presiding judge must determine whether the value of the evidence substantially outweighs its prejudicial effect." *Id.*

This rule of law is embodied in Pa.R.E. 609, which provides, in relevant part, as follows:

**Rule 609. Impeachment by evidence of conviction of crime**

(a) General rule. For the purpose of attacking the credibility of any witness, evidence that the witness has been convicted of a crime, whether by verdict or by plea of guilty or *nolo contendere,* shall be admitted if it involved dishonesty or false statement.

(b) Time limit. Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date, unless the court determines, in the interests of justice, that the probative value of the conviction substantially outweighs its prejudicial effect. However, evidence of a conviction more than ten years old as calculated herein is not admissible unless the proponent gives to the adverse party sufficient advance written notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence.

\* \* \*

(d) Juvenile Adjudications. In a criminal case only, evidence of the adjudication of delinquency for an offense

16. We subsequently clarified in *Commonwealth v. Jackson,* 526 Pa. 294, 585 A.2d 1001 (1991), that the *Randall* rule "establishes an impediment which extends for ten years from the last day of confinement for the offense. The relevancy of the dishonest act is expiated only by the passage of ten uninterrupted years of *freedom;* time spent in confinement for the offense does not count in the passage of the ten-year impeachment period." *Id.* at 1003 (emphasis supplied).

under the Juvenile Act, 42 Pa.C.S. §§ 6301 *et seq.*, may be used to impeach the credibility of a witness if conviction of the offense would be admissible to attack the credibility of an adult.

We explained in *Randall* that the following factors should be considered by the trial court in determining whether previous convictions, which are outside the ten-year time frame, are admissible for purposes of impeachment: "(1) the degree to which the commission of the prior offense reflects upon the veracity of the defendant-witness; (2) the likelihood, in view of the nature and extent of the prior record, that it would have a greater tendency to smear the character of the defendant and suggest a propensity to commit the crime for which he stands charged, rather than provide a legitimate reason for discrediting him as an untruthful person; (3) the age and circumstances of the defendant; (4) the strength of the prosecution's case and the prosecution's need to resort to this evidence as compared with the availability to the defense of other witnesses through which its version of the events surrounding the incident can be presented; and (5) the existence of alternative means of attacking the defendant's credibility." *Id.*, 528 A.2d at 1328 (citing *Commonwealth v. Roots*, 482 Pa. 33, 393 A.2d 364, 367 (1978)).[17]

Appellant argues that all five adjudications fell outside the ten-year time frame that would have rendered such evidence *per se* admissible under Rule 609(b), and were only admissible if their probative value outweighed any prejudicial effect. Contrary to the trial court's ruling, Appellant submits that the prejudicial effect clearly outweighed any probative value because most of the adjudications occurred when he was thirteen or fourteen years' old, and he was twenty-six years'-old at the

17. These factors were originally developed by our Court in *Commonwealth v. Bighum*, 452 Pa. 554, 307 A.2d 255 (1973), and *Commonwealth v. Roots, supra,* but were abrogated in *Randall* in favor of the bright-line general rule adopted therein, which is set forth in Rule 609. We held in *Randall,* however, that the *Bighum/Roots* factors were still relevant when weighing the probative value against the prejudicial effect of admitting *crimen falsi* convictions that did not fall within the ten-year window of the rule.

time of trial. Further, Appellant contends that the number of adjudications "besmirched" his character and suggested to the jury that Appellant had a propensity to commit the crime for which he was charged. Finally, and, most significantly, he maintains that evidence of his previous juvenile adjudications severely prejudiced him because credibility was critical to the jury's determination of whether to believe Appellant's claim that he was justified in using deadly force. Appellant asserts that Officer Eddinger was the primary Commonwealth witness who observed the events leading to the shooting, and could not have testified as to Appellant's state of mind when he fired the fatal shots. Thus, he concludes that the entire case rested on credibility determinations, which he maintains would have been different had the jury not been aware of his juvenile adjudications.

The Commonwealth counters that the trial court did not abuse its discretion in denying Appellant's motion *in limine* to preclude admission of his juvenile adjudications. Initially, it asserts that the various juvenile adjudications fall within the ten-year provision of Rule 609, and are automatically admissible because Appellant was still under some type of supervision within ten years of the date of trial. Regardless of whether the adjudications fall within the requisite time period of Rule 609, however, the Commonwealth maintains that the trial court properly held that the probative value of the *crimen falsi* adjudications outweighed any prejudicial effect because they "reflect substantially upon [Appellant's] veracity and do not suggest a propensity to commit the serious offense with which [Appellant] was charged in this case, namely murder." Trial Court Opinion at 9. For the same reasons that Appellant advocates the evidence was prejudicial, the Commonwealth argues such evidence was probative, *i.e.*, because Appellant's credibility was critical due to the fact that he asserted a claim of self-defense. The Commonwealth emphasizes that it bore the burden of proving that Appellant's acts were not justifiable, and it had no other means to do so other than presenting the testimony of Officer Eddinger and impeaching the testimony given by Appellant.

"When reviewing the denial of a motion *in limine,* this Court applies an evidentiary abuse of discretion standard of review." *Commonwealth v. Mitchell,* 588 Pa. 19, 902 A.2d 430, 455 (2006). It is well-established that the admissibility of evidence is within the discretion of the trial court, and such rulings will not form the basis for appellate relief absent an abuse of discretion. *Commonwealth v. Baumhammers,* 599 Pa. 1, 960 A.2d 59 (2008). Appellant has failed to demonstrate an abuse of discretion here. Initially, it is undisputed that the Commonwealth provided to Appellant the requisite written notice of intent to use such evidence under Rule 609. For purposes of argument, we further assume that in all five cases, more than ten years had passed since the "date of the adjudication of delinquency or the last day of confinement and the time of trial." *Randall,* 528 A.2d at 1329.[18] Accordingly, as did the trial court, we examine whether the probative value outweighs the prejudicial effect arising from admission of the evidence.

Considering the factors reiterated in *Randall,* we conclude that the trial court acted within its discretion in determining that Appellant's previous *crimen falsi* adjudications were more probative than prejudicial. First, as noted by the Commonwealth and the lower court, the previous adjudications of *crimen falsi* offenses were relevant to the jury's determination of Appellant's credibility, which was the crux of the case considering that no witness could testify as to Appellant's belief that the killing was justified, except for Appellant himself. While Officer Eddinger testified as to the circumstances surrounding Appellant's shooting of Officer Wertz, he was unable to opine on what Appellant believed at the time. We further note that Appellant's juvenile adjudications did not suggest a propensity to commit murder, as they were all theft offenses. While the age of Appellant at the time the offenses

18. The trial court specifically held that "in all of the cases more than ten years had passed since the date of the adjudication of delinquency or the last day of confinement." Trial Court Opinion at 9. While the Commonwealth summarily challenges this finding, and asserts that the adjudications should be *per se* admissible as falling under the ten-year provision in Rule 609, the record is unclear as to precisely when Appellant served his "last day of confinement" on the adjudications.

were committed may militate against admission of the evidence, the remaining factors, namely the prosecution's need to resort to this evidence and the lack of alternative means of attacking Appellant's credibility, clearly favor admission. Under these circumstances, we decline to hold that the trial court abused its discretion in denying Appellant's motion *in limine*.

### IV. Cautionary Instruction During Penalty Phase

■ Appellant next argues that the trial court erred by denying his request for a cautionary instruction during the penalty phase after the prosecutor committed misconduct during closing argument. Specifically, after the conclusion of the penalty phase testimony, the prosecutor made the following remark in her closing argument.

When Judy Wise tried to find out what happened, when Criminal Investigator Wise begged the people in the crowd to come forward and say what happened, those people that were on the street 2:00 in the morning, the associates of [Appellant] and the other people that were there, what did they say? Excuse me for saying, "F_ _ _ you all. F_ _ _ the cops." Not the kind of people that are a part of the solution. These people are part of the problem. [Appellant] was part of the problem.

N.T. 8/13/2008 at 126.

Appellant contends that because the trial court failed to caution the jury that the quoted reference did not reflect Appellant's state of mind or his attitude toward police, the verdict of death was a product of prejudice and the arbitrary factor of his alleged hatred toward law enforcement. Accordingly, he requests that we reverse the sentence of death and remand for a new penalty hearing.

The Commonwealth persuasively submits that this claim is waived. Defense counsel did not object during the prosecutor's closing argument or immediately thereafter. Instead, after completing his own closing argument and following a fifteen-minute recess, defense counsel requested a cautionary instruction, asserting the same grounds set forth herein. *Id.* at 135. The trial court pointed out that the prosecutor's

comment was based on testimony given during the guilt phase of trial, and that defense counsel could have objected at the time of the prosecutor's closing, but did not do so. *Id.* at 135–36.

This Court has held that the lack of a contemporaneous objection constitutes a waiver of any challenge to the prosecutor's closing remarks. *Commonwealth v. Powell,* 598 Pa. 224, 956 A.2d 406, 423 (2008) (providing that the "absence of a contemporaneous objection below constitutes a waiver of appellant's current claim respecting the prosecutor's closing argument") (citing Pa.R.A.P. 302(1); and *Commonwealth v. Butts,* 495 Pa. 528, 434 A.2d 1216, 1219 (1981) (providing that the failure to object during or after summation constitutes a waiver of prosecutorial misconduct claim)). Here, as noted, the prosecutor had completed his closing argument, defense counsel had completed his closing argument, there had been a fifteen-minute recess, and, only as the court was about to begin its charge, did Appellant object and seek a curative instruction. Under these circumstances, Appellant's failure to object to the prosecutor's comments immediately after the closing argument constitutes a waiver of his claim.

## V. Cross–Examination Regarding Bias of Officer Eddinger

 Finally, Appellant contends that the trial court erred in precluding defense counsel from asking and eliciting answers from Officer Eddinger regarding bias. He reiterates that the premise of his defense was that he was unaware that Officer Wertz was a police officer, and that, at the moment he fired his weapon, believed that his life was in danger. Because the jury's credibility determination of Appellant's testimony regarding his state of mind was critical to the defense, he maintains that it was imperative for him to be able to adequately challenge Officer Eddinger's credibility. He asserts that the following exchange demonstrates that the trial court improperly limited his cross-examination and precluded him from establishing Officer Eddinger's bias.

DEFENSE COUNSEL: Did it ever go through your mind what a jury might think if [Appellant] did not know that Wertz was a police officer?

OFFICER EDDINGER: Yes.

DEFENSE COUNSEL: And as you sit there today, are you concerned what the jury may think if he did not know—

PROSECUTOR: Objection.

DEFENSE COUNSEL:—Wertz was a police officer?

THE COURT: Objection sustained.

DEFENSE COUNSEL: I understand, just looking at you earlier today, that you were upset rehashing, thinking about your partner being shot, being on the sidewalk. Do you, based upon what took place that evening, hold any sense of guilt or responsibility?

PROSECUTOR: Objection.

THE COURT: Objection sustained.

DEFENSE COUNSEL: Do you have an interest in the outcome of this trial, Officer Eddinger?

OFFICER EDDINGER: Sure.

DEFENSE COUNSEL: Do you want to see [Appellant] put to death?

PROSECUTOR: Objection.

THE COURT: Objection sustained.

DEFENSE COUNSEL: Can we see the Court at side bar?

THE COURT: No, you can't. You can ask another question.

DEFENSE COUNSEL: Court's indulgence, Your Honor. (Pause.)

DEFENSE COUNSEL: Nothing further.

N.T. 8/4/2008 at 190–191.

■■ It is clear that the trial court has the discretion "to determine the scope and limits of cross-examination and that this Court cannot reverse those findings absent a clear abuse of discretion or an error of law." *Commonwealth v. Nolen*, 535 Pa. 77, 634 A.2d 192, 195 (1993). A thorough review of the

record indicates that the trial court did not abuse its discretion or commit an error of law in the instant case.

The trial court sustained the three aforementioned Commonwealth objections because the answers being solicited "constituted a needless presentation of cumulative evidence, as it is inconceivable that the jury could have believed that Officer Eddinger held the man who admitted to intentionally killing his partner and friend in high regard." Trial Court Opinion at 14. The court held that the question regarding whether Officer Eddinger held himself responsible for his partner's death was "speculative, overly broad, and irrelevant." *Id.* Similarly, it concluded that Officer Eddinger's views regarding the death penalty were irrelevant. *Id.* The court further noted:

> Aside from these two particular questions, the record reflects that defense counsel was otherwise permitted to fully cross-examine Officer Eddinger regarding any potential bias. Officer Eddinger testified that he was close with Officer Wertz, that they had been partners for about a year, that they had been to each other's homes, and that they discussed their families and hobbies. (N.T. at 162–63). Furthermore, Officer Eddinger testified that after the shooting, he wanted to ride along in the ambulance with Officer Wertz because he was concerned and wanted to make sure that his partner was going to be okay. (N.T. at 185).

Trial Court Opinion at 14.

Thus, it is clear from the record that the trial court did not limit Appellant's cross-examination of Officer Eddinger regarding bias, but merely exercised its discretion in accordance with the law and properly sustained three Commonwealth objections. The first question raised by defense counsel, to which the Commonwealth successfully objected, inquired whether Officer Eddinger was concerned about what the jury may have thought if Appellant did not know Officer Wertz was a policeman. The second inquiry delved into whether Officer Eddinger held any sense of guilt or responsibility for the shooting. The final question to which the Commonwealth

successfully objected inquired whether Officer Eddinger wanted to see Appellant put to death. It is self-evident that these lines of inquiry are irrelevant to the task facing the jury. Appellant's claim, therefore, fails.

Having disposed of Appellant's claims, we must affirm the sentence of death unless we determine that it was a product of passion, prejudice, or any other arbitrary factor. 42 Pa.C.S. § 9711(h)(3)(i). Following a thorough review of the record, we conclude that the sentence of death was not a product of passion, prejudice, or any other arbitrary factor, but was based upon the evidence presented at trial. Additionally, we conclude that the sentence complies with 42 Pa.C.S. § 9711(c)(1)(iv), which requires that a sentence of death be imposed when the jury finds one or more aggravating circumstances that outweigh any mitigating circumstances. Finally, pursuant to 42 Pa.C.S. § 9711(h)(3)(ii), we hold that the evidence was sufficient to support at least one aggravating circumstance.

Accordingly, we affirm the verdicts and sentence of death.[19]

Chief Justice CASTILLE, and Justice EAKIN, Justice TODD, Justice McCAFFERY and Justice GREENSPAN join the opinion.

Justice SAYLOR concurs in the result.

19. The Prothonotary of the Supreme Court is directed to transmit a complete record of this case to the Governor in accordance with 42 Pa.C.S. § 9711(i).