J-A05014-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| KAISIM KEYES | : | |
| | : | |
| Appellant | : | No. 3376 EDA 2019 |

Appeal from the Judgment of Sentence Entered June 20, 2019
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0006439-2017

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| KAISIM KEYES | : | |
| | : | |
| Appellant | : | No. 3377 EDA 2019 |

Appeal from the Judgment of Sentence Entered June 20, 2019
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0006440-2017

BEFORE: OLSON, J., NICHOLS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY OLSON, J.: **FILED: MAY 17, 2021**

Appellant, Kaisim Keyes, appeals from the judgments of sentence entered on June 20, 2019, as made final by the denial of Appellant's post-sentence motions on September 3, 2019. We affirm.

The trial court ably summarized the underlying facts of this case:

_____

[*] Former Justice specially assigned to the Superior Court.

[From 2014 through 2017, K.G.] was under the supervision of Doria Edney. [Appellant] was a friend and sometime[-]paramour of [Ms.] Edney. Ms. Edney was responsible for homeschooling K.G. for kindergarten and [second grade and, on occasion, Ms. Edney] babysat [K.G.] after school and on weekends. . . .

Beginning in 2013, L.T. . . . was under Ms. Edney's care on some weekends. Both K.G. and L.T. would occasionally spend the night at Ms. Edney's apartment, which she shared with [Appellant].

### K.G.

When K.G. was seven years old, [Appellant] began inappropriately touching her. Sometimes, while in [Appellant's] bedroom at Ms. Edney's apartment, [Appellant] would touch [K.G.] with his hands and mouth on her chest and private parts, including her buttocks and vagina. On one occasion, K.G. recalled that Ms. Edney had gone out for the evening and [Appellant] forced [K.G.] into his room for the "surprise." When K.G. entered [Appellant's] room, [Appellant] began touching and licking her chest under her clothes.

K.G. testified about multiple occasions of abuse. K.G. stated that one time, while playing video games in [Appellant's] room, [Appellant] tried to bribe her with individual pieces of chocolate. [Appellant] held up some pieces of chocolate, demanded that K.G. [lie] down on his bed, and pulled down [K.G.'s] pants and underwear. [Appellant] then proceeded to lick her vagina and poke her vagina with his fingers. K.G. testified that another time, [Appellant] touched and rubbed her butt with his hands on top of her clothing.

On multiple occasions, [Appellant] ordered K.G. to "tap" his penis with her tongue and lick the top part of it. K.G. stated that she obeyed [Appellant] because otherwise, he would yell at her, hold up the chocolate, and make her touch his penis with her tongue. K.G. described [Appellant's] penis as "oval"-shaped and the body part that "boys pee through." K.G. stated that she had only looked at it once and that these events would usually occur late in the evening, while Ms. Edney was asleep.

K.G. also testified that[,] sometimes, [she,] L.T., [and Appellant] . . . would be in [Appellant's] bedroom playing video games when [Appellant] would start trying to bribe L.T. to lick his penis. K.G. stated that she [did not] pay close attention to what [Appellant] was doing to L.T., but knew that it was similar to what he was doing to her. At times, [Appellant] would show K.G. videos on his iPod which depicted acts similar to what [Appellant] did to her. K.G. described the videos as depicting adults touching each other, with the girl's mouth on the boy's penis. K.G. explained that she had not [informed] her mother or anyone else about [Appellant's] behavior because [Appellant] told her not to say anything[; she also testified that she listened to Appellant] because he was an adult and would yell at her.

On July 12, 2017, [K.G.'s mother] entered K.G.'s bedroom and observed K.G. quickly exit out of an application she had opened on her electronic tablet. [K.G.'s mother] thought K.G.'s behavior was suspicious so she asked K.G. what she had been doing. K.G. responded [that she had] been playing a game and attempted to pull up a game. The duration of the loading screen indicated otherwise to [K.G.'s mother], causing her to take K.G.'s tablet away and look at her YouTube search history.

During [her] examination of K.G.'s YouTube search history, [K.G.'s mother] came across some videos which concerned her, such as one video titled ["Storybook Sexual Abuse Story"] and another video depicting the male genitalia in CGI-format. At trial, K.G. testified that [Appellant] had instructed her to look up what he was doing to her and provided her with search words, including "sex abuse," and sites [such as] YouTube. . . .

Afterward, [K.G.'s mother] called K.G. to her room to ask her some questions about the videos. Upon being questioned by her mom, K.G. went on to hesitantly explain that [Appellant] made her play the "boy game." K.G. explained this game as [Appellant] making her put her mouth on his private. [K.G.'s mother] asked K.G. if [Appellant] ever touched her and K.G. ashamedly pointed to her vaginal area and then to her buttocks. [K.G.'s mother] called the police shortly after K.G. told her about [Appellant]. The police transported [K.G.'s

mother] and K.G. to the Special Victims Unit. While at Special Victims, [K.G.'s mother] was asked to provide information about L.T.

L.T.

At some time prior to when L.T. was nine or ten years old, [Appellant] began touching her inappropriately. L.T. testified that she, and sometimes her older brother, would spend the night at Ms. Edney's apartment. L.T. recalled that on one occasion, when Ms. Edney was in the kitchen, [Appellant] was playing a video game on the Wii console with her and K.G. when [Appellant] suddenly stood up and pulled his pants and underwear down. K.G. and L.T. remained seated next to one another when this occurred and [Appellant] revealed his [penis] to them. [Appellant] then proceeded to demand that K.G. suck his penis and K.G. did as she was told. Afterwards, [Appellant] ordered L.T. to suck his penis and L.T. also did as she was told. At trial, L.T. recalled that this type of interaction would occur every time she spent the night at Ms. Edney's apartment.

L.T. testified that she did not tell her mother about [Appellant's] actions because she was afraid she would get in trouble and that her mother would accuse her of "acting grown." L.T. further explained that she did not tell Ms. Edney about [Appellant's] behavior because she thought that Ms. Edney already knew since the two of them lived together. L.T. stated that she did not tell anyone about what [Appellant] was doing to her because she was afraid of what people would think. She testified that others would think that she was "nasty," it was her fault, and that she was "too grown."

During cross-examination at trial, L.T. testified that she had lied to the Philadelphia Children's Alliance ("PCA") interviewer, the court during the preliminary hearing, and the trial court during her earlier testimony. L.T. testified that she had lied about how many times [Appellant] had sexually abused her because she was afraid of telling other people, such as friends and family, about being sexually assaulted and how many times it had occurred. She further explained that she had previously testified that it had only happened

once because she was embarrassed and [did not] want anyone to know it had occurred multiple times.

Trial Court Opinion, 5/18/20, at 1-5 (citations and some capitalization omitted).

A jury found Appellant guilty of two counts each of: involuntary deviate sexual intercourse with a child, indecent assault of a person less than 13 years of age, unlawful contact with a minor, and corruption of a minor.[1] On June 20, 2019, the trial court sentenced Appellant to serve an aggregate term of 20 to 40 years in prison, followed by four years of probation, for his convictions.

Following the denial of Appellant's post-sentence motions, Appellant filed timely notices of appeal. Appellant raises one claim in this consolidated appeal:[2]

> Was not the verdict against the weight of the evidence and should not a new trial be granted in the interests of justice?

Appellant's Brief at 3.

As our Supreme Court has explained:

> a verdict is against the weight of the evidence only when the [factfinder's] verdict is so contrary to the evidence as to shock one's sense of justice. It is well established that a weight of the evidence claim is addressed to the discretion of the trial court. A new trial should not be granted because of

---

[1] 18 Pa.C.S.A. §§ 3123(b), 3126(a)(7), 6318(a)(1), 6301(a)(1)(ii), respectively.

[2] On February 14, 2020, we *sua sponte* consolidated Appellant's two appeals. Order, 2/14/20, at 1.

a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. Rather, the role of the trial court is to determine that notwithstanding all the evidence, certain facts are so clearly of greater weight that to ignore them, or to give them equal weight with all the facts, is to deny justice. A motion for a new trial on the grounds that the verdict is contrary to the weight of the evidence concedes that there is sufficient evidence to sustain the verdict; thus the trial court is under no obligation to view the evidence in the light most favorable to the verdict winner.

Significantly, in a challenge to the weight of the evidence, the function of an appellate court on appeal is to review the trial court's exercise of discretion based upon a review of the record, rather than to consider *de novo* the underlying question of the weight of the evidence. In determining whether this standard has been met, appellate review is limited to whether the trial judge's discretion was properly exercised, and relief will only be granted where the facts and inferences of record disclose a palpable abuse of discretion. It is for this reason that the trial court's denial of a motion for a new trial based on a weight of the evidence claim is the least assailable of its rulings.

*Commonwealth v. Rivera*, 983 A.2d 1211, 1225 (Pa. 2009) (quotations and citations omitted). "An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record." *Commonwealth v. Serrano*, 61 A.3d 279, 290 (Pa. Super. 2013) (quotations and citations omitted).

On appeal, Appellant claims that the trial court erred when it denied his weight of the evidence claim because "[n]o reasonable person could find the [victims'] contradictory testimony reliable where [] they each had a motive to

lie,[3] gave different stories unsupported by physical evidence and described repeated acts of sexual assault happening to them in a room with no door in an apartment too small for the other occupants to have failed to notice it happening." Appellant's Brief at 12-13. Appellant's argument fails. As the trial court explained:

> [Appellant] argues that the jury's guilty verdict was against the weight of the evidence presented and a new trial should be granted because[:] (1) K.G.'s testimony was not credible because she was motivated to fabricate her allegations to avoid getting in trouble for watching inappropriate YouTube videos and to get away from Ms. Edney's apartment where she could not make friends; (2) L.T.'s testimony was not credible because she was motivated to fabricate her allegations in order to get away from Ms. Edney's apartment where she was unable to hang out with her friends and L.T.'s testimony that she repeatedly lied about the alleged abuse in the PCA video, to the police, at the preliminary hearing, and at trial; (3) K.G. and L.T.'s testimony was unreliable as it contained many inconsistencies regarding the description of the abuse and[] L.T.'s description of events and abuse differed drastically from K.G.'s testimony in terms of occasions, acts, and possibly a third witness (L.T.'s older brother); and (4) photographs of Ms. Edney's apartment showed there was no privacy for the abuse to occur and [Appellant] had a reputation for being peaceful, law-abiding, and non-violent.
>
> In this case, it was the sole province of the jury, as the fact-finder, to assess K.G. and L.T.'s credibility, determine the weight to be given to their testimony, and resolve any conflicts in their testimony. Here, the jury weighed the evidence presented, evaluated K.G. and L.T.'s testimony, and found them to be credible, as it was entitled to do. The jury

---

[3] Appellant claims that the victims had motives to lie "to avoid getting in trouble for watching sexual videos on a tablet [and] to get out of having to go to Ms. Edney's house anymore." Appellant's Brief at 17.

believed K.G.'s testimony was credible enough to overcome [Appellant's] argument that K.G. had a motive to lie in order to avoid getting into trouble and to leave Ms. Edney's care. Vigorous cross-examination was done by [Appellant's] attorney in the areas of K.G.'s motive to fabricate. The motives argued by counsel [were] that: (1) K.G. [did not] want to get in trouble with her mother for watching the aforementioned YouTube videos and (2) [] K.G. [did not] want to be [homeschooled] any longer at Ms. Edney and [Appellant's] apartment. After being questioned by [Appellant's] attorney, K.G. conceded that she wanted to go to regular school to meet new friends. Despite this answer and the vigorous cross-examination on these areas of motive to fabricate, the jury believed K.G. to be credible and that these criminal acts took place. Similarly, despite [Appellant's] argument that L.T. also had a motive to lie, the jury clearly believed L.T.'s testimony of the abuse perpetrated against her. L.T. merely stated once, during cross-examination at trial when directly asked by [Appellant's] attorney, that she preferred her grandmother's house "a little bit[.]" Clearly the jury did not believe this was a motive for L.T. to fabricate the events about which she testified.

L.T. admitted to lying about the number of times she was sexually abused to the PCA interviewer, to the police, at the preliminary hearing, and at trial. Despite this admission, the jury found L.T.'s testimony at trial credible. Their verdict clearly indicates that they found her rationale for making false statements on prior occasions to be credible. Finally, it is clear that the jury found L.T.'s trial testimony to be credible and worthy of belief.

[Appellant] argues that there were multiple inconsistencies between the testimony of K.G. and L.T. However, the jury was able to reconcile these inconsistencies in K.G. and L.T.'s testimony regarding the description of the abuse. The final jury instructions state "If you find there were conflicts in the testimony, you have the duty of deciding which testimony to believe. But you should first try to reconcile, that is, fit together any conflicts in the testimony if you can fairly do so." In fact, the only inconsistency was whether [Appellant] had performed anal sex and oral sex on L.T. K.G. testified that she had observed [Appellant] lick L.T.'s vagina and put

- 8 -

his penis in L.T.'s buttocks whereas L.T. testified that she had only performed oral sex on [Appellant]. Aside from these minor differences, the testimony was nearly identical. [Appellant] argues that L.T.'s description of events and abuse differed drastically in terms of occasions, acts, and a possible third witness, L.T.'s brother. However, L.T. never mentioned that her brother was in the same room when the abuse occurred and therefore, he was unlikely to be a witness.

Next, [Appellant] argues that given the layout of the apartment, this abuse could not have taken place without someone else witnessing it. While the evidence presented shows that the apartment may not have had the most privacy, the jury obviously felt that it did not preclude [Appellant's] actions from occurring within the residence. Further, there was testimony that much of the abuse occurred when Ms. Edney was sleeping.

Finally, [Appellant] argues evidence of [his] good character should have been enough to overcome K.G. and L.T.'s testimony. Although the instruction provided to the jury regarding character evidence states, "Evidence of good character may by itself raise a reasonable doubt of guilt and require a verdict of not guilty," the instruction also states, "You must weigh and consider the evidence of good character along with the other evidence in the case. If, on all the evidence, you have a reasonable doubt of the defendant's guilt, you must find him not guilty. However, if, on all the evidence, you are satisfied beyond a reasonable doubt that the defendant is guilty, you should find him guilty." Thus, other evidence can overcome evidence of [Appellant's] character traits of being peaceful and law-abiding. Here, the jury did not find that the evidence of [Appellant's] good character was enough to overcome the allegations and supporting evidence from K.G. and L.T.'s testimony. The jury's verdict of guilty on all charges does not shock one's sense of justice, therefore, the verdict was not against the weight of the evidence.

Trial Court Opinion, 5/18/20, at 5-9 (citations omitted).

We agree with the trial court's cogent analysis and conclude that the trial court did not abuse its discretion when it denied Appellant's weight of the evidence challenge. Therefore, Appellant's claim on appeal fails.

Judgment of sentence affirmed. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/17/21